UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR No. 0:14-362-JFA |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| JAMARIO ARTEZ FORD | ) | |
| _____ | ) | |

This matter is before the court on defendant's *pro se* motion for a reduction in his sentence pursuant to the First Step Act of 2018 and 18 U.S.C. § 3582(c)(1)(A) (ECF No. 530). The defendant contends that his 324-month sentence is excessive as a result of his two "stacked" § 924(c) gun convictions and this presents an extraordinary and compelling reason for the court to reduce his sentence.[1]

The government has responded in opposition, and the defendant filed a supplement to his original motion. The court has carefully considered the record before it and conducted an individualized analysis of the facts and issues raised by the parties. For the reasons which follow, the defendant's motion is granted in part and denied in part.

---

[1] In an attachment to his § 3582 motion entitled "Personal Statement," the defendant opines that Coleman Low, where he is housed within the Bureau of Prisons, does not have the ability to currently house inmates in accordance with CDC guidelines regarding the COVID-19 pandemic. The defendant also states, "Like any normal American, I am fearful of getting this virus. And though this motion is not based on medical grounds I do have cause for concern medically; being that I am an African American male that is overweight (per CDC guidelines). As such I implore you to find that extraordinary and compelling circumstances exist in my case and allow me the opportunity to return to my family in good health." The defendant indicates that his motion is *not* based on medical grounds or the COVID-19 pandemic. Because this court has found an independent "extraordinary and compelling reason" to modify the defendant's sentence, the court does not deem the defendant's statement as a separate claim for review.

1

## STANDARD OF REVIEW

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *See United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492 (4th Cir. 2020); *United States v. Martin,* 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *See Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. It was originally adopted as part of the Sentencing Reform Act of 1984.

On December 21, 2018, the First Step Act was signed into law. Broadly, the Act's goals were to reform federal prisons and sentencing laws to reduce recidivism, decrease the federal inmate population, and maintain public safety. The First Step Act also expanded the existing compassionate release provisions of federal law by allowing an inmate to move for compassionate release himself, rather than allowing only the Director of the Bureau of Prisons (BOP) to do so. The relevant portion of the First Step Act, codified at 18 U.S.C. § 3582(c)(1)(A), as amended by § 603(b) of the First Step Act, provides:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the

2

factors set forth in section 3553(a) [of Title 18] to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

By its terms, § 3582(c)(1)(A) permits the court to reduce the defendant's term of imprisonment after considering the factors set forth in  18 U.S.C. § 3553(a) if the court first finds that (i) extraordinary and compelling reasons warrant such a reduction; and (ii) such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.  In addition, a district court may not grant a sentence reduction under § 3582(c)(1)(A) without considering the § 3553 factors to the extent they are applicable. *United States v. Kibble*, 992 F.3d 326, 332 (4th Cir. 2021).

In *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), the Fourth Circuit agreed with the Second Circuit in *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020) and found that there is, as of now, no "applicable policy statement governing compassionate release motions filed by defendants under the recently amended § 3582(c)(1)(A)," and as a result, district courts are "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise."  *McCoy*, 981 F.3d at 284 (citing *Brooker*, 976 F.3d at 230); *see also*, *Kibble*, 992 F.3d at 331.

A defendant's rehabilitation standing alone does not provide sufficient grounds to warrant a sentence modification. 28 U.S.C. § 994(t).  Also, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*,

3

836 F.3d 896, 899 (8th Cir. 2016).

When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court generally proceeds in three steps.  *See United States v. High*, 997 F.3d 181, 185–86 (4th Cir. 2021).  First, the court determines whether "extraordinary and compelling reasons" support a sentence reduction.  Next, the court considers whether a sentence reduction is consistent with applicable policy statements issued by the Sentencing Commission.  As noted previously in this order and as set out in *McCoy*, because there is no applicable policy statement governing compassionate release motions filed by defendants under the recently amended  § 3582(c)(1)(A), district courts are empowered to consider any extraordinary and compelling reason for release that a defendant might raise. Finally, if the court finds that extraordinary and compelling reasons warrant relief, the court must consider the § 3553(a) factors in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment.

Even if the defendant meets the eligibility criteria for compassionate release, this court retains discretion as to whether to grant relief. *See* 18 U.S.C. § 3582(c)(1)(A) (providing the court *may* reduce the term of imprisonment) (emphasis added).

## Exhaustion of Administrative Remedies

Before a court may consider a defendant's motion for compassionate release, the defendant must  have fully exhausted all of the administrative rights to appeal a failure of the Bureau of Prisons (BOP) to bring a motion on the defendant's behalf or the lapse of 30 days with no answer from the Warden after a request by the defendant, whichever is earlier.

4

18 U.S.C. § 3582(c)(1)(A).

The government concedes that the defendant has fully exhausted his administrative remedies, therefore, the court will proceed to review the matter on the merits.

### *§ 924 and Stacking*

In § 403 of the First Step Act of 2018, Congress amended 18 U.S.C. § 924(c) so that it does not apply unless a defendant had a previous, final conviction for a § 924(c) charge at the time of the offense.[2] This effectively did away with the so-called "stacking" procedure that had been followed by the district courts across the country for many years. The First Step Act expressly provided that this change in the law was *not* retroactive.

In *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2021), however, the Fourth Circuit Court of Appeals indicated that the former practice of stacking § 924(c) convictions could be considered in a fresh look at sentencing under motions brought pursuant to § 3582(a)(1)(C) of the First Step Act.

*McCoy* was perhaps the most significant sentencing decision handed down by the Fourth Circuit in recent years. In that decision, the Court discussed at length the changes related to sentences under § 924(c) prior to and subsequent to the First Step Act. Specifically, prior to enactment of this landmark legislation, a conviction under § 924(c) was

---

[2] Based on this amendment, § 924(c)(1)(C) now provides: "In the case of a violation of this subsection that occurs after a prior conviction under this subsection has become final, the person shall – (i) be sentenced to a term of imprisonment of not less than 25 years. . . ." The other provisions of § 924(c), including those requiring a 7 year mandatory minimum term for brandishing a firearm in relation to a crime of violence, and directing that each sentence under § 924(c) must run consecutively to any other sentence imposed, remain unchanged.

treated as "second or subsequent" (thereby triggering the 25-year mandatory minimum sentence) even if the first § 924(c) conviction was obtained in the same criminal case. The First Step Act ended this practice known as "stacking" by clarifying that the 25-year mandatory minimum applies only when a prior § 924(c) conviction arises from a separate criminal case and has already become final. As summarized by the Fourth Circuit, "Under Section 403 of the First Step Act . . . the 25-year mandatory minimum is 'reserved for recidivist offender, and no longer applies to multiple § 924(c) convictions obtained in a single prosecution." *McCoy*, at 275 (quoting *United States v. Jordan*, 952 F.3d 160, 671 (4th Cir. 2020)).

Notwithstanding the statutory language making the anti-stacking provision non-retroactive, the Court held that a defendant seeking reconsideration of his sentence could assert that the First Step Act's revised sentencing law in § 924(c) convictions may meet the "extraordinary and compelling" standard in compassionate release motions.

Finally, and most importantly, the *McCoy* Court stressed the "severity of [the] § 924(c) sentence, combined with the enormous disparity between that sentence and the sentence that a defendant would receive today." *Id*. at 285.

PROCEDURAL HISTORY

*The Offense Conduct*

On January 18, 2011, officers with the Columbia Police Department responded to a call regarding an armed robbery at Wild Wing Café located on Bower Parkway in Columbia, South Carolina. Officers interviewed the restaurant manager who provided a detailed account

6

of the robbery. According to the manager, he walked outside of the restaurant through the rear exit at approximately 8:58 a.m. to throw some linens away in the dumpster behind the building. Once he was outside, he observed two black males standing beside the dumpster wearing work gloves and acting suspiciously. When he looked back at them, the manager indicated both black males, later identified as Jamario Ford and Alfred Turnipseed, rushed toward him brandishing handguns while wearing masks.

According to the manager, Ford and Turnipseed forced him back into the restaurant at gunpoint and demanded to know the location of the restaurant's safe. While continuing to brandish the weapon, Ford followed the manager to the office where the safe was located. Meanwhile, Turnipseed approached another restaurant employee and instructed him at gunpoint to lie on the floor. Turnipseed then took the employee's cell phone from his pants pocket. Turnipseed then encountered Darryl Wright, one of the co-defendants, and instructed Wright at gunpoint to lie on the floor. Turnipseed subsequently patted Wright down and felt his wallet and cell phone but did not take them. Wright later advised the officer he could hear Ford yelling at the manager saying, "Hurry or I will shoot you". The manager was able to open the restaurant safe and gave Ford all of the money inside which totaled $9,956.00. After collecting the money, Ford and Turnipseed fled out of the back door on foot and ran into the woods behind the other businesses in the strip mall.

On May 25, 2011, officers with the Columbia Police Department responded to a call regarding an armed robbery at the same Wild Wing Café. Upon arrival at the scene, officers made contact with the restaurant employees and witnesses who provided detailed accounts

of the robbery. Thurmond Walker, an employee of a nearby business, stated he was smoking a cigarette at the rear of the business when he observed three men, later identified as Carl Wood, Jamario Ford, and Alfred Turnipseed, wearing ski masks exit from a 2006 Ford Focus. As he was approached by Woods, Ford, and Turnipseed, Walker advised one of the men grabbed him by the neck, held a gun to his back, and yelled, "Get up, get up, come with me!," while dragging him towards the back of the business. Walker advised Woods, Ford, and Turnipseed also grabbed Charles Mullins, who was standing in front of the door, and threw him to the ground. Walker stated while he and Mullins were being held at gunpoint on the ground, one of the robbers demanded their cell phones, and both men complied with the demand.

After obtaining Walker's and Mullins' cell phones, Walker indicated Woods, Ford, and Turnipseed knocked on the back door of Wild Wing Café and yelled, "Truck!" so an employee would think a delivery truck had arrived. Employee Carrie Lyerly opened the door and was immediately overtaken at gunpoint by Woods, Ford, and Turnipseed. Lyerly later told officers she panicked and fell to the ground. Once the robbers entered the business with Walker, Mullins, and Lyerly being held at gunpoint, Walker told officers Woods, Ford, and Turnipseed put them in the bathroom located in the rear of the business. Once inside the bathroom, Walker related Mullins was able to lock the door. A few seconds later, one of the robbers attempted to open the door, and, upon discovering the door was locked, began yelling for them to open the door or "I'm gonna shoot this motherfucker up." Fearful for his life, Walker stated he opened the door. According to Walker, one of the robbers pushed the door

8

open, pointed his gun at them, demanded they be quiet, and shut the door back. Approximately five minutes later, Walker indicated Mullins left the bathroom, saw the robbers had left, and called the police.

Brian Neal, a manager at Wild Wing Café, stated he walked into the manager's office at approximately 9:00 a.m. on the morning of the robbery to do paperwork. Approximately five minutes later, Neal heard a knock at the backdoor and witnessed Lyerly walk to the door to open it. Neal stated he heard "hollering" at the back door but did not think much of it due to the fact it seemed normal in the regular work atmosphere. A few seconds later, Neal related his office door was forced open, and Neal saw a black male pointing a nickel-plated revolver towards his head. The man told Neal to open the safe. Neal stated he entered the safe's combination incorrectly during the first two attempts. Neal indicated he became nervous as he knew if he entered the combination incorrectly for a third time, the safe would lock him out. Neal explained this issue to the robber and told him he needed to calm down so he could successfully open the safe. The robber lowered his gun from Neal's head and stepped back. Neal successfully opened the safe and gave the robber $5,600.00 in U.S. currency. Neal told the robber, "If you hold the bag open, I'll load all the money into it because I don't want to lose my life over this." After Neal put all the money into the canvas bag, the robber exited the office and another black male came in and knocked down all the computers, telephones, and everything on the countertops.

Paul Chimel, the restaurant manager, told responding officers he was in the kitchen when Turnipseed, came in with a gun and told him to get on the ground. Chimel advised

9

Turnipseed attempted to disguise his voice because he (Turnipseed) was formerly employed at Wild Wing Café and had a speech impediment which would give away his identity. After Ford, Turnipseed, and Woods fled the business, Chimel indicated he locked the back door, exited through the front door of the business, and walked to his vehicle to call law enforcement.

As part of their active investigation into the Wild Wing Café robberies, the police "pinged" the cell phones which were stolen from the May 25, 2011 robbery. The phones were found later that day and the police found a fingerprint on one of the phones and were able to determine that it belonged to Woods. The police began looking for Woods but were unable to find an address for him; however, on June 14, 2011, Woods, Ford and Turnipseed, were arrested for an armed robbery of a Bi-Lo grocery store in Columbia.

On June 14, 2011, officers with the Columbia Police Department responded to a call regarding an armed robbery at Bi-Lo located in Columbia, SC. After interviewing victims and witnesses on the scene, investigators learned three armed men, later identified as Woods, Ford, and Turnipseed entered the store and demanded cell phones from customers and employees before taking approximately $2,095.00 from the money office. Surveillance video captured Ford carrying out the white garbage bag filled with money and stolen goods. During the course of the robbery, a witness stated she heard a gunshot fired while she was in the store. Another witness provided officers with a description of the getaway vehicle as a white Mitsubishi missing a right front hubcap.  Based on that description, CPD officers dispatched all officers in the area to be on the lookout for the car.

10

CPD Master Police Officer (MPO) Robert Uhall was in the immediate area of the robbery when he heard the dispatch officer advised of a pending call referencing a man with a gun at 4000 Plowden Road in Columbia, SC. MPO Uhall answered the call and responded to the Columbia Gardens Apartment Complex located on Plowden Road. As he was patrolling the area near building 29, MPO Uhall found the neighborhood to be quiet and cleared the dispatch call as unfounded. Before leaving the apartment complex, MPO Uhall observed a white Mitsubishi Mirage in front of building 19 which matched the description of the vehicle used to drive away from the Bi-Lo armed robbery. MPO Uhall inspected the vehicle and observed black clothing on the front passenger floor board covering up what appeared to be a silver handgun with gray duct tape wrapped around the handle. MPO Uhall called dispatch for assistance, and additional officers arrived to set a perimeter around the area.

While securing the area, MPO Uhall was approached by a woman who told him she saw three black males exit the Mitsubishi Mirage and enter an unknown apartment in building 19. CDP officers made contact with the residents in building 19 and eliminated several of the apartments as suspected hiding places for the robbers. MPO Uhall knocked on the door at apartment E in building 19 and waited several minutes before a pregnant woman, later identified as Tila Terry, opened the door. When asked if she was the only person in the apartment, Terry told him there was no one in the apartment other than herself. While looking over Terry's shoulder, MPO Uhall was able to see a black male with shoulder length dreadlocks, later identified as Woods, standing in the hall.

Fearing Terry may have been being held against her will, MPO Uhall pushed open the door and ordered Woods to the ground. As MPO Uhall was handcuffing Woods, Ford and Turnipseed came into the room and were arrested.

CPD officers obtained and executed a search warrant on Apartment 19E. During the search, officers located the following items: (1) a Harrington and Richardson 12 gauge shotgun bearing serial number BA541415 and a Stevens and Tool 12 gauge-shotgun bearing serial number 63681 inside a kitchen closet; (2) a white trash bag containing $2,067.00 in U.S. currency, 19 packs of Swisher Sweets cigarillos, 8 packs of Swisher Sweets blunts inside the kitchen closet; (3) two pair of black Nike tennis shoes, a pair of black pants, and a black ski mask inside a bedroom closet; (4) two packs of Newport cigarettes and a roll of gray duct tape in the top left drawer of a bedroom dresser; (5) a 9mm Hi-Point semiautomatic firearm, bearing serial number P072969 with one round of 9mm Luger ammunition in the chamber and two rounds of 9mm Winchester ammunition in the magazine on a bedroom floor; and (6) a black ski mask in a box on the top shelf of a shelving unit in the living room. During a search of the Mitsubishi Mirage, CPD officers discovered the following items: (1) a .357 caliber Smith & Wesson revolver, Model 65-2, bearing serial number 1D52831 located on the front passenger floor board; (2) a black thermal shirt, a black ski mask, black sock stockings, a black baseball cap, and a pair of blue latex gloves located on the front passenger floor board.

Following his arrest, Turnipseed was advised of his Miranda warnings and provided the following written statement to investigators:

12

At 5 a.m., Q (Woods) came to my house and mom said he at the door. I got up went to the door, and he say Jamario want me. I put some close on and went. When I got there Jamario say U ready to pay dat money. I don't have it. He say I want and need my money. So go home and get some close and come on we going to get it. They have guns so I'm scared and I go. We go and I say I can't do it. They left and met bugg. He got in. He say I got no close. Jamario say give him your shirt and shoes. I did and went that way to bilo. Q was driving Jamario in the passenger. Me and the other guy in the back. They pull up, went it. I got behind the driver seat then they came out go in and pull away. Went to Tila house. Got out wit bag and went in. They made me go. I didn't want to. Jamario had a silver gun and Q had a black 1. I don't know what bugg have and Tila had nothing to deal with it. Jamario tried to make me go cause I owe him money for my bond. Please don't tell them I told.

Turnipseed identified "Q" as Carl Woods and "Jamario" as Jamario Ford. Turnipseed further stated the group used a "4 door white little car" to commit the robbery. Turnipseed claimed Ford initially told him on June 11, 2011, he wanted his (Turnipseed's) help to rob the Bi-Lo. According to Turnipseed, Ford advised he, Wood, and Turnipseed would participate in the armed robbery. After Woods parked the car in front of the grocery store, Ford told the group "what they gone do and where to go." Turnipseed indicated they put on masks before getting out of the car. Turnipseed asserted Ford instructed "Don't open that door and go in the back room" when the police arrived at Terry's apartment after the robbery.

On June 15, 2011 and February 17, 2012, Wright was interviewed concerning his knowledge of and involvement in the armed robberies of the Wild Wing Café. According to Wright, he was at the home he shared with Albert Wallace, Ford, Turnipseed, and Woods during the first week of January 2011. He stated they were just hanging out drinking and smoking marijuana and began to discuss how "gravy" (easy) it would be to commit a robbery at Wild Wing Café, Wright's and Wallace's place of employment.

Wright told the group the restaurant did not have a working security camera system. Wright further provided information as to when the business opened, who was typically inside the business during the early morning hours, and the location of the manager's office and where the money was kept. Wright told the group employees usually arrived at 9:00 a.m. to prepare for the day and to accept deliveries. Wright advised Turnipseed previously worked at the restaurant and had some knowledge of how the business operated. Wright stated on or about January 18, 2011, he was contacted by Turnipseed and Ford, who told him they and Wallace were planning on robbing the Wild Wing Café. Ford and Turnipseed told Wright to "not know nothing." According to Wright, they instructed him to answer the rear door, which was often used for deliveries, when they knocked on it. On the morning of the robbery, Wright indicated the restaurant manager exited the rear door to dispose of dirty linens in the dumpster located behind the business. When the manager exited, Wright stated Turnipseed and Ford were in the back preparing for the robbery. Wright assumed they were not ready to commit the robbery, as Turnipseed did not have his mask on at the time the manager exited; however, Wright stated when the manager made contact with them, Ford and Turnipseed pointed their firearms at him and forced him back into the business. Wright stated Turnipseed was the first to enter the restaurant, pointed his firearm at him (Wright), and commanded him to lie down outside of the manager's office. Wright stated the robbery lasted for about one minute before Turnipseed and Ford fled the restaurant on foot and went back to the home he (Wright) shared with Wallace.

During the robbery, Wright stated Ford and Turnipseed removed cell phones from the manager and another employee but not from him. After his shift was over, Wright stated he went back to his home and met with Ford and Turnipseed, who paid him $500.00 in cash for his assistance in the robbery. On January 20, 2012, Albert Wallace, Jr., was interviewed concerning his knowledge of and involvement in the armed robbery of the Wild Wing Café. Wallace stated on January 18, 2011, Ford and Turnipseed arrived at his residence and told him they were going to rob the Wild Wing Café. Wallace confirmed both Ford and Turnipseed were in possession of a firearm. Wallace indicated Wright was a participant in the robbery and was supposed to open the rear door of the restaurant when Ford and Turnipseed knocked.

In summary, Ford was involved with a conspiracy with Turnipseed and Carl Woods to commit at least three armed robberies throughout the Columbia area of South Carolina. On January 18, 2011, Ford and Turnipseed robbed the Wild Wing's Café. During this robbery, they again brandished firearms to order the victims at gunpoint to move inside the store and unlawfully stole $9,956.00. On May 25, 2011, Turnipseed, Woods, and Ford entered the Wild Wing Café located on Bower Parkway in Columbia, SC. During this robbery, Turnipseed, and Ford brandished firearms to order victims at gunpoint to move from outside the store (or from the rear doorway) to inside the bathroom area. In addition to stealing these victims' cellular phones, Turnipseed, Wood and Ford unlawfully stole $5,600.00 from the restaurant. Further, on June 14, 2011, Turnipseed, Woods, and Ford entered the Bi-Lo grocery store located on Devine Street in Columbia, SC, where they forced

employees at gunpoint to lay on the floor and stole their cellular phones. During the robbery, Turnipseed, Woods, and Ford took an undisclosed number of cigarette cartons and $2,095.00 in U.S. currency from the grocery store. Upon fleeing the store location, Turnipseed discharged his weapon firing one round from his firearm.

Following their arrests on June 14, 2011, Woods and Turnipseed admitted their involvement and participation in both the armed robbery of the Wild Wing Café and the armed robbery of the Bi-Lo on June 14, 2011.

In the Presentence Report (PSR), victim impact restitution amounts totaled just more than $18,000. In addition, the PSR referenced the defendant and his co-defendants had engaged in obstruction of justice. Following his arrest, the police intercepted 16 letters that Ford wrote to Turnipseed, Wright, and Woods. In one letter to Turnipseed, Ford wrote, "Our lawyer told use [sic] the reason you was not in court was that you took the plea … We just want to know if we take it to trial is you going to testify against us? I know you signed a proffer agreement. So I know they might make you testify against us. I just want to know is you gonna testify if I take it to trial? I would've never did you like this … I hope you don't let me down again. We'll see. You know I never wrote a statement on you." *Id*. In a letter to Darrell Wright, Ford wrote, "My lawyer came and seen me yesterday. Even though you tried to kill me off with those statements they are not using none of that stuff against me. Because they know you are just trying 2 get your time cut. So you did me wrong for no reason … The real reason I wrote this is to tell you we still got a chance to get a better plea deal than they are offering … We can't let them white folks come between us. We have known each other

16

for 7 years that gotta count for something." Id. at 50. From approximately July 2, 2011, through January 30, 2013, Ford wrote 13 letters to Carl Woods, who was incarcerated at the Alvin S. Glenn Detention Center in Columbia, SC. In a letter dated July 12, 2011, Ford referred to Turnipseed, stating he ran into him in the detention center medical facility. He stated, "I snapped on that nigga. I couldn't put them beatax on him cause it was 2 many C.O.s. But that nigga head was shaking like a mo fucka. Like a sketzo or something. His mamma been tellin him all kind of lies so that's why he wrote that statement. He was about 2 cry in that bitch beggn for forgiveness. He say it's eating him up and he will take back the statements he wrote on us. I told him he need 2 do that A.S.A.P!!! We need 2 get the story str8 … I'm just playing him so he can take them statements back." Each of the subsequent letters from Ford to Woods encouraged him to keep his mouth shut and reminded him of Ford's tattoo which says, "See Nothing, Hear Nothing, or Say Nothing."

*The Indictment and Court Proceedings*

The defendant and four co-defendants (Carl Woods, Alfred Turnipseed, Darrell Antonio Wright, and Albert Wallace) were charged in a 10-count Indictment with:

Count 1:     conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951.

Count 2:     Hobbs Act robbery on January 18, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

Count 3:     using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, on January 8, 2011, in violation of 18 U.S.C. § 924(c)(1), (c)(1)(A)(ii) and 18 U.S.C. § 2;

17

Count 4:    Hobbs Act robbery on May 25, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

Count 5:    using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, on May 25, 2011, in violation of 18 U.S.C. §§ 924(c)(1), (c)(1)(A)(ii) and 18 U.S.C. § 2;

Count 6:    Hobbs Act robbery on June 9, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

Count 7:    using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, on June 9, 2011, in violation of 18 U.S.C. §§ 924(c)(1), (c)(1)(A)(ii) and 18 U.S.C. § 2;

Count 8:    Hobbs Act robbery on June 14, 2011, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

Count 9:    using and carrying firearms during and in relation to, and did possess firearms in furtherance of a crime of violence, and did brandish said firearms, and cause one of said firearms to be discharged on June 14, 2011, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), (c)(1)(A)(iii) and 18 U.S.C. § 2; and

Count 10:    felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), 924(a)(2) and 924(e).

The defendant pleaded guilty, pursuant to a written plea agreement (ECF No. 257), to Counts 5 and 9, both of which charged violations of § 924(c). The remaining Counts 1, 2, 3, 4, 6, 7, and 8 were dismissed on motion of the government at sentencing.

The Presentence Report ("PSR") (ECF No. 313) prepared by the United States Probation Office calculated the otherwise applicable guideline range for this case, but then advised that the defendant's sentence should be driven by the statutory penalties for the counts of conviction, rather than the sentencing guidelines. Specifically, the mandatory

18

minimum sentence on Count 5 was 7 years (84 months), and the mandatory minimum sentence on Count 9 was 25 years (384 months), with a maximum of Life, with the provision that the sentence on Count 9 must run consecutive to any other term of incarceration. The 2012 version of the Guidelines Manual was used in the calculations.

Based upon these statutory provisions, on August 22, 2013 this court sentenced the defendant to 384 months consisting of 84 months on Count 5 and 300 months on Count 9, both sentences to run consecutively.

Thereafter, the defendant filed a notice of appeal and the Fourth Circuit Court of Appeals affirmed the defendant's conviction.[3]

As noted earlier in this order, § 403 of the First Step Act amended § 924(c) to provide that the 25-year consecutive term for a successive § 924(c) offense does not apply unless the defendant had a previous, final conviction for a § 924(c) charge at the time of the offense.

If sentenced today, the defendant would face the same 7 year sentence on Count 5, but only a 10 year sentence on Count 9. The statute still requires each such sentence to run consecutively to each other and to any other sentence imposed. That means the mandatory minimum sentence on two § 924(c) counts, if charged today as in the same initial § 924(c) prosecution, would be 17 years instead of 32 years.

---

[3] *See United States v. Ford*, 585 Fed. Appx. 848 (4th Cir. 2014). The defendant thereafter filed a motion for relief under 28 U.S.C. § 2255 which was denied by this court on October 11, 2019 (ECF No. 479).

The defendant has been in federal custody since January 17, 2012 and he is scheduled to be released on January 22, 2039. He has served approximately 9 years and 9 months of this 384-month sentence, or 30 % of his sentence.

## IV.  ANALYSIS

With this background, the court now turns to the ultimate question of whether the anti-stacking authorization of *McCoy*, together with this court's individualized assessment of the defendant's crimes, call for a reduced sentence as requested by the defendant. If sentenced today, the defendant would be facing a sentence of 17 years instead of 32 years. He has thus demonstrated an extraordinary and compelling reason for a sentence reduction. As explained further below, the court feels that this extraordinary and compelling reason, when combined with a review of the § 3553(a) factors, warrants this court's consideration of providing some relief to the defendant, although not all relief sought.

*Factors under 18 U.S.C. § 3553(a)*

The court now turns to a review of the § 3553(a) factors:

1. *Nature and Circumstances of the Offense*. The defendant participated in a most serious criminal violation as set out in detail earlier in this order. The defendant benefitted significantly from the prosecutor's agreement to dismiss the remaining eight counts against him. The government ( through the same Assistant United States Attorney who prosecuted this case originally) now argues that had the government known that the defendant would not be facing a "stacked" § 924(c) sentence for the two counts of conviction, the government

would never have agreed to drop so many other counts.[4]  However, other district courts have rejected such arguments, suggesting that they require the court to engage in speculation and this court adopts the rational employed in those decisions.  *See United States v. Smith*, 39 F.Supp. 543 (W.D.Va 2019); *United States v. Steppe*, 3:16-cr-22 (W.D.Va., Apr. 20, 2021).

2.  *History and Characteristics of Defendant.*   The defendant was 30 years old when he committed the instant crimes.  He is now approximately 40 years old and is serving his sentence at the Federal Correctional Institution in Coleman, Florida, with a scheduled release date of February 5, 2039.

The PSR sets out in greater detail the defendant's characteristics, as well as his criminal history and convictions which include burglary, concealing the death of another, simple possession of marijuana, and possession of controlled substances.  With a criminal history score of 4, the PSR placed the defendant in a criminal history category of III.  The defendant had other criminal conduct in the State of Georgia which included cocaine possession, unlawful carrying of a weapon, armed robbery, and kidnapping.

The defendant has had several disciplinary violations while incarcerated at the BOP, including possession of a cell phone and charger in 2017, possession of a hazardous tool in 2015, and possession of a non-hazardous tool in 2015.

In regard to his release plans, the defendant asserts that he has several family members who will assist him with his introduction back into society and he intends to live with his

---

[4]  This may well be the reason that Congress expressly stated that the anti-stacking provision of the First Step Act was not retroactive.  A retroactive application upsets settled bargains from years ago that were made in good faith.

Aunt. He also plans to attend trucking school to obtain his Commercial Drivers License. He attaches to his motion various letters from family and individuals seeking this court's leniency for the defendant.

The defendant received his GED while at the BOP and has taken multiple vocational and educational courses on the subjects of piano, parenting, employment, exploring construction trades, interview techniques, grooming for success, money management, and other health-related courses.

3. *Seriousness of the Crimes*. As evidenced by the historical facts set out in the PSR involving the defendant's instant convictions, this court regards the defendant's crimes as very serious, fully supportive of a significant sentence.

4. *Whether the Sentence Promotes Respect for the Law and Just punishment for the offense*. The court finds a significant sentence is necessary to promote respect for the law and just punishment.

5. *Whether the Sentence Affords Adequate Deterrence to Criminal Conduct*. The court finds that a significant sentence is necessary to provide both general and specific deterrents.

6. *Whether the Sentence Protects the Public from Future Crimes of the Defendant*. The court finds that a significant sentence is necessary to protect the public from future crimes of the defendant.

7. *Need to Avoid Unwarranted Sentencing Disparities*.

Given that mandatory minimums drove the defendant's sentencing, the defendant's sentence was fully in line with similarly situated defendants at the time it was issued.

## V. CONCLUSION

Although the defendant's offenses were extremely serious and involved at least two separate armed robberies, the court concludes that the defendant has demonstrated an extraordinary and compelling reason for relief under § 3582(c)(1)(A) regarding his stacked § 924(c) charges. That is, if the defendant were sentenced today, his sentence would be substantially lower as a result of the changes to the statute made by the First Step Act. The court reaches this conclusion after carefully considering the individualized circumstances of the case, and after considering the § 3553(a) factors.

The defendant's previously imposed sentence of 384 months is reduced to a total of 240 months, consisting of 84 months on Count 5 and 156 months on Count 9, to run consecutively to the sentence on Count 5. The defendant's term of supervised release remains at 3 years. All other provisions of the original judgment remain in full force.

To the extent that the sentence imposed herein on Count 9 could be considered a variance, the court determines that such action is appropriate considering the severity of the crimes at issue, the fact that the defendant attempted to obstruct justice, the fact that other counts of the indictment were dismissed, and all of the other § 3553(a) factors mentioned above.

IT IS SO ORDERED.

October 5, 2021                              Joseph F. Anderson, Jr.
Columbia, South Carolina              United States District Judge